NEWTOWN TOWING CO. et al. v. THE
CHESTER et al.

THE POLING BROS. NO. 15.

THE RUSSELL NO. 3.

No. 18719.

United States District Court
E. D. New York.

May 1, 1952.

---

Alexander & Ash, New York City, proctors for libelants (Edward Ash, New York City, advocate).

Burlingham, Veeder, Clark & Hupper, New York City, proctors for respondent (Frederic Conger, New York City, advocate).

BYERS, District Judge.

Decision is here required concerning fault for a collision between the libelants' oil barge Poling No. 15, and the Long Island carfloat No. 22 in the upper bay in the vicinity of the mouth of Greenville Channel, on March 24, 1947 at about 5:30 A.M.

The cause was laid against the tug Chester having The No. 22 in tow on her starboard side, and her owner the Pennsylvania Railroad. The latter claimed the tug, and impleaded the tug Russell No. 3 which had The No. 15 in tow.

The issue is more simple in statement than in resolution, namely: Did The Chester maneuver her tow (there was a carfloat also on her port side, both laden, and the make-up being in the customary pigeon-toed form) so as to swing into and interfere with the apparent course of the other tow the presence and heading of which were clearly and timely observed by The Chester.

I can find in the testimony no answer except in the affirmative, for reasons to be shown.

Only the matters in dispute will be stated as findings since the controversy is limited to the issue stated.

The only physical condition of importance is the force of the ebb tide, for it is agreed that neither wind nor lack of visibility contributed to the happening. Day was about to break on a clear morning and the testimony is that each tow became aware of the other in ample time to take proper precautions to avoid trouble; in other words, the collision should not have occurred.

The Russell tow consisted of the oil barge Poling Bros. No. 15, laden, which was towed alongside to port of the Russell No. 3. The former is a steel vessel 208 x 42 and as laden, had a freeboard midships of 3 feet. The tug is of the diesel type, 450 h. p. 69 x 20 and had a draft of 10½ feet. Her stern was about 5 feet forward of that of her barge. Departure from Port Newark was had at 3:10 A.M. destination Pier 7 N.R. The make-up of both tows is free from criticism, as is the power of the respective tugs. It is also agreed that both tows were displaying all proper lights, which were showing. The Russell tow proceeded in a northerly direction at an estimated speed of between 3 and 4 knots against this ebb tide. As this tow was off the Greenville Channel where it meets the upper Bay, her position as indicated by both navigators on the chart (Lib. Ex. 1) when about abreast of Flashing Green light buoy was not less than 700 feet therefrom.

(They both estimated the distance to be greater than that.) In that approximate position of the Russell tow, the latter observed the Chester tow in the Greenville Channel, heading out in an easterly direction; the latter also saw the former on its heading as stated.

The elements of the Chester tow were the tug (95 x 25 draft not stated) 750 h. p.; the steel carfloat L.I. 22 to starboard (330 x 43) and the L.I. 20 (290 x 40) to port, both fully laden with freight cars. The bow of the tug between the floats was about 160 feet aft of the bows of the floats. Standing in the pilot house of the Chester, her navigator could see over the tops of the cars, except down to a space of about 30 feet off the far side of the floats. The Chester tow had left Pier B of the Pennsylvania Greenville freight yard at about 5:15 A.M. some 15 minutes or so before the collision. Her speed prior to reaching the buoy is said to have been about 3 m. p. h.

There was no look-out posted on the Poling No. 15, or on either of the floats, but since both navigators say they observed the other tow, when The Russell was off the Greenville Channel, this omission cannot be deemed to have constituted a fault which contributed to the collision.

It is found (a) that when the tows came into mutual sight a crossing situation was in the making, in which the Russell tow would occupy the holding on position, and the Chester tow was the burdened element.

The destination of the latter was Long Island City, i. e. across the Bay in a generally northeast direction to and around Governor's Island.

No whistle signals were exchanged between these tows until both blew alarm signals a few seconds before a collision. That striking was between the starboard bow of The 22 and The Poling 15 at about 5 feet forward of the latter's port stern corner.

The impact is so described in the impleading petition. Dennen's testimony—"He landed broadside of me as far as I could see * * * just abreast the bow of the tug up against the float * * *"—is assumed to refer to the bow of The Chester, 150 feet

aft of the bow of The 22, but Dennen couldn't see the collision, as has been said.

That event occurred after the Chester tow had begun to round the Flashing White buoy at the northerly edge of Claremont Channel just to the north of Greenville Channel, and since the rounding maneuver concededly took place, the question for decision is whether it was conducted so close to that buoy that the Russell tow could not have been struck unless it sagged over so as to interfere with its accomplishment; or whether the Chester swung around so broadly off that buoy that The 22 was brought into danger of contact with The Poling 15 while the Russell tow was proceeding in the course and at the speed in which she was first observed by the Chester.

The argument for the latter is based entirely upon the force of the tidal current that was running in these waters at the time. There is little impressive evidence on this subject, but such as it is, it should be stated: Dennen gave it as his opinion that the rate was "about two miles an hour." O'Brien of The Russell said "I should say about four mile an hour."

Lib. Ex. 3 is a letter of advice from the U.S.C. & G.S. dated January 28, 1948 quoting records and computing the current velocity at 5:35 A.M. on this date at .04 of a knot. Since the maximum of this ebb began at 2:32 A.M. with a velocity of 1.8 knots it is fair to infer that three hours later the true velocity was appreciably less than the latter figure. The flow was 200° true which means that the Russell tow was breasting the tide about head on.

In view of the foregoing testimony I cannot summon the temerity to make a finding as to the strength of the tide, but shall base a decision on the theory that it did not exceed 1 knot an hour.

In any case it was not sufficient to force the Russell tow down upon and across the bow of the L.I. float 22, and this is stated as finding (b).

The maneuver of the Chester and her floats to round the buoy at the northern edge of the Claremont Channel was not to be anticipated on The Russell, at the time

when these two came into mutual sight, the destination of the former not being apparent. Nor is it seen why the turn should have been as much as Dennen described it when he said it was not "all the way straight up the river". His probable course would only incline him enough to the north of Governor's Island to allow that the ebb tide should not deflect him below Buttermilk Channel, if that was his intermediate objective. The effort to interpret the turn that was made into such a maneuver as to put the Russell tow into an overtaking position, is less than convincing, and by a wide margin.

All that The Russell did was to hold her course and speed, which she was bound to do as the situation opened; she did not rest under any contrary compulsion by any maneuver of the Chester tow which has been convincingly demonstrated until it became evident that the latter's navigation was neither one thing nor the other; that is, she did not hold back to pass under the stern of the Russell tow, nor did she signal to ask the latter to forgo its privilege, nor did she turn as close to the buoy as her testimony was designed to establish. The Russell tow was far enough out into the waters north of the naval anchorage according to Dennen's own testimony, to enable even a 300 foot carfloat to be turned as desired, without fouling.

There was at least a lack of alertness in the pilot house of The Chester including the failure to post a look-out on the starboard float, once the Russell tow was observed; this leads to the conclusion presently held, that the navigator of The Chester was not equal to the requirements of the known situation. If the turning maneuver had been decided upon at once, it seems clear that the floatman would have been promptly posted to give proper signals in the process of its accomplishment. Instead, he (Folz) remained in the pilot house until the rounding of the buoy. He said that as his tow came out of Greenville Channel "I spotted this Russell boat coming upstream, off our starboard hand, about five or six hundred yards away.

"Then I didn't look around any more because I figured, well, the captain, he seen him and the other captain seen us."

The inference would be permissible, although it is not put in the form of a finding, that the Chester's own account of the happening following the inception of litigation, was so confused that the original allegation in the petition to the effect that the Russell tow was first observed "off the port bow" was not an inadvertent statement of the pleader.

From all the evidence it is concluded that the libelants have sustained the burden of proof, and that the impleading petition has failed in that respect. The libelants may take the usual decree with costs, and the impleading petition is dismissed without costs.

Settle decree.